IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-1440

**John Doe, a minor, by and through his mother, Jane Doe,**

    Plaintiff,

v.

**Academy District 20**

    Defendant,

---

**COMPLAINT AND JURY DEMAND**

---

John Doe ("Mr. Doe" or "Plaintiff"), by and through counsel, Igor Raykin, Michael Nolt, and Allie Parrott of Kishinevsky & Raykin, LLC, respectfully files this action against Defendant, Academy District 20 ("Academy" or "Defendant"), and states on information and belief as follows. This action seeks injunctive relief and appropriate damages and costs.

### I.    JURISDICTION AND VENUE

1. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331. Federal question jurisdiction arises under the Constitution and laws of the United States of America, including but not limited to the Americans with Disabilities Act (42 U.S.C. 12101 *et seq.*), Child Find 34 C.F.R. 300.111, and Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 701 *et seq.*).

2. The Court has jurisdiction over the state law claims under 28 U.S.C. § 1367.

3. Plaintiff John Doe is a resident of El Paso County, Colorado.

4. Defendant Academy District 20 has as its principal place of business El Paso County,

Colorado.

5. Venue is proper pursuant to 28 U.S.C. § 1391(b) as the wrongful acts alleged by the Plaintiff occurred in whole or in part in El Paso County, Colorado.

## II.     THE PARTIES

6. Mr. Doe has been a student at Aspen Valley Middle School ("School" or "Aspen Valley") since the Spring of 2018.

7. Aspen Valley is a school within the Defendant's district.

8. Mr. Doe is a disabled individual as defined by the American with Disabilities Act ("ADA"). The ADA provides that an individual is disabled for purposes of the Act when a person has an impairment that "substantially limits a major life activity." 42 U.S.C. 12102(1). Major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id*.

9. Mr. Doe's disabilities include anxiety, depression, attention deficit hyperactivity disorder ("ADHD"), adjustment disorder and resulting learning disabilities.

10. Mr. Doe's disabilities substantially limit the major life activities of decision making, learning, reading, concentrating, thinking, working, and social interaction.

11. Mr. Doe is on medication and receives private counseling.

12. As a result of Mr. Doe's disabilities, Jane Doe ("Ms. Doe"), Mr. Doe's mother, sought accommodations from Aspen Valley.

13. Mr. Doe was granted accommodations under a 504 Plan on October 11, 2018. These accommodations included frequent check-ins for understanding, a quiet workspace, and extra "think time."

14. Although the 504 Plan indicates that Mr. Doe has difficulty with task initiation and executive functioning, several of his accommodations required him to self-advocate in order to receive those accommodations.

15. Since his enrollment into Aspen Valley on February 18, 2018, Mr. Doe has had numerous behavior issues resulting in suspensions.

16. On February 20, 2018, Mr. Doe picked on a student on the bus and used derogatory language. This resulted in a two-day suspension.

17. On March 19, 2018, Mr. Doe did not follow directions and would not complete class work. He also played with a small flashlight during class after being told to put it away. This resulted in a one-day suspension.

18. On April 26, 2018, Mr. Doe made the statement in class, "We should go shoot up some schools." School security responded, searched Mr. Doe's belongings, and determined there was no credible threat. This resulted in a one-day suspension.

19. On May 1, 2018, Mr. Doe lost bus riding privileges for 2 days after making loud and distracting noises on the bus.

20. On September 14, 2018, Mr. Doe found a screw on the ground at school and held it to another student's throat in a playful manner. He was suspended for three days as a result and a safety plan was put in place.

21. The safety plan, dated September 19, 2018, required parents to search Mr. Doe and his bag, forbade Mr. Doe from bringing or picking up anything that is considered a weapon, and required Mr. Doe to think on how his actions would impact others.

22. This safety plan was terminated on February 7, 2019, because Mr. Doe allegedly demonstrated a sustained period of time without concerning behaviors.

23. On September 24, 2018, Mr. Doe found a lighter on the ground between the high school and the middle school and was flicking it on during class. This was a fidgeting mannerism common in children with ADHD, and Plaintiff did not intend to start a fire.

24. Rather than refer Mr. Doe for an evaluation for special education services, Defendant suspended Plaintiff for two and a half days.

25. On October 1, 2018, Ms. Doe contacted the school and requested a meeting to discuss a 504 Plan.

26. On October 11, 2018, Ms. Doe met with the school to discuss placing Mr. Doe on a 504 Plan. Rather than conduct a formal evaluation of Mr. Doe, the school drafted a 504 Plan during the meeting. No goals were listed in this plan, and the accommodations listed required a substantial amount of self-advocacy on Mr. Doe's part without accompanying supports by the school to assist him in such self-advocacy, thereby deviating from best practices in a school environment.

27. On March 8, 2019, Mr. Doe brought a small knife to school. He had also written entries in his language arts notebook concerning violence toward a teacher. This resulted in a three-day suspension, and a safety plan was to be re-established upon his return to school.

28. A revised safety plan, dated March 18, 2019, required Mr. Doe to be searched at the request of a school administrator prior to school entry, no unsupervised periods during the school day, an escort to/from all classes, and a supervised lunch period.

29. In March of 2019, the School was notified that Mr. Doe was seeing Ms. Kristi Gallego ("Ms. Gallego"), a Professional School Counselor. In her letter to the School, Ms. Gallego described Mr. Doe's mental health disorders. Ms. Doe gave Ms. Gallego permission to correspond with the School. However, the School was aware of this information as early as

the Fall of 2018.

30. On April 3, 2019, Mr. Doe brought a Leatherman knife to school that he had forgotten was in his pocket. This resulted in a five-day suspension. This suspension placed Ryan over the 10-day suspension limit.

31. A manifestation determination review ("MDR") was conducted on May 23, 2019 to address Mr. Doe's behavioral incidents, including peer violation with physical contact, inappropriate use of a lighter in school, questionable writings involving a teacher, and bringing a dangerous weapon on campus.

32. The MDR found that Mr. Doe's conduct was a manifestation of his disabilities and directly related to his identified ADHD. As a result, a functional behavior assessment ("FBA") and a behavior intervention plan ("BIP") were to be conducted in the Fall of 2019.

33. On May 28, 2019, Mr. Doe was playing with a pair of scissors outside at School and then stood behind another student and mimicked making a lateral cut across the student's throat with the scissors. As a result, a threat assessment was conducted, and Mr. Doe was suspended for three days.

34. Of note, the fact that Mr. Doe was playing outside without one-on-one supervision when this incident occurred was a violation of the safety plan created by the School.

35. On May 29, 2019, prior to an MDR hearing being held, George Stone ("Mr. Stone") and Robin Koldenhoven ("Ms. Koldenhoven"), the outgoing and incoming principals at Aspen Valley, called Dr. Jim Smith ("Mr. Smith"), Assistant Superintendent for Administrative Services, to initiate the expulsion process.

36. Another MDR hearing was conducted on June 6, 2019. Administrators were present at this meeting; however, there were no other school personnel present who were personally

familiar with Mr. Doe or his disabilities.

37. At the hearing, Ms. Doe attempted to provide the Administrators with letters from Mr. Doe's psychiatrist and counselor. The Administrators refused to review these letters.

38. Administrators at the hearing found that, because of impulsiveness and poor decision-making, Mr. Doe had been suspended for 16.5 days. They also found that Mr. Doe did not actively advocate for his needs.

39. Although the team was split on the question of manifestation, Mr. Doe's behavior from May 28 was not found to be a manifestation of his disabilities.

40. On June 13, 2019, Ms. Koldenhoven requested that the District extend Mr. Doe's suspension from three days to 10 days because his behavior violated the most current safety plan.

41. Ms. Doe requested an expulsion hearing once she became aware of the District's intentions.

42. On June 27, 2019, Mr. Doe participated in an indirect threat assessment conducted by Nicoletti-Flater Associates.

43. The threat assessment found that Mr. Doe had engaged in Proactive Attack and Attack-related behaviors, Reactive Attack behaviors, and significant Social and Psychological Disruption. Mr. Doe's behaviors indicated an escalation in attack behaviors, attack related behaviors, and social and psychological disruption.

44. On July 24, 2019, the District held an expulsion hearing. At that hearing, the District attempted to refer to Mr. Doe's past behaviors that had been found to be manifestations of his disabilities as a justification for expulsion.

45. Ms. Doe requested that Mr. Doe be re-evaluated for an IEP. However, the District wanted Nicoletti-Flater Associates to conduct the evaluation.

46. Plaintiff was ultimately expelled from Aspen Valley.

### III.     CLAIMS AND CAUSES OF ACTION

### A.  FIRST CLAIM FOR RELIEF
### (VIOLATION OF SECTION 504 OF THE REHABILIATATION ACT)

47. Mr. Doe reincorporates and realleges all other paragraphs as if fully set forth herein.

48. Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, and its implementing regulations apply to recipients of federal financial assistance from the Department of Education.  *See* 34 C.F.R. § 104.2.  Academy District 20 receives such federal financial assistance and is thus subject to Section 504.

49. Among other things, Section 504 requires that:

> A recipient may not, directly or through contractual or other arrangements, utilize criteria or methods of administration (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons, or (iii) that perpetuate the discrimination of another recipient if both recipients are subject to common administrative control or are agencies of the same states.  C.F.R. § 104.4(b)(4).

50. Education institutions have a "real obligation…to seek suitable means of reasonably accommodating a handicapped person *and to submit a factual record indicating that it conscientiously carried out this obligation.*"  *Wong v. Regents of the Univ. of California*, 192 F.3d 807, 817 (1999) (quoting *Zukle v. Regents of the Univ. of California*, 166 F.3d 1041, 1048 (9th Cir. 1999) and *Wynne v. Tufts Univ. Sch. Of Med.*, 932 F.2d 19, 25-26 (1st Cir. 1991) (en banc)).

51. Mr. Doe is a qualified individual with a disability under Section 504.

52. Despite notice of Mr. Doe's qualifying handicaps, the District intentionally discriminated against him, was deliberately indifferent to his rights, and intentionally denied him benefits solely on the basis of his disabilities.

53. The District also failed to provide Mr. Doe with reasonable accommodations that allowed him access to an education because his 504 Plan was not designed to meet his individual educational needs. Although the District developed a 504 Plan for Mr. Doe, the plan was not based on any formal evaluation and the accommodations provided to him required an amount of self-advocacy that Mr. Doe did not possess. The District was aware of the fact that Mr. Doe did not possess the ability to self-advocate, as it referenced this in prior MDR hearings. Because of Mr. Doe's impulsive nature and inability to self-advocate when needed, he was not able to utilize the accommodations offered to him.

54. Furthermore, as indicated by his repeated behavior infractions, the accommodations put in place were not sufficiently tailored to Mr. Doe's individual needs. Mr. Doe experienced an increased occurrence and escalation of impulsive, inappropriate conduct following the implementation of the 504 Plan in October 2018. Of note, the major behavior incidents engaged in by Mr. Doe (bringing a knife to school and holding a pair of scissors up to another student's neck) occurred after October 2018. He was suspended for more than 10 days between March 2019 and May 2019. Safety plans were developed, yet Mr. Doe continued to have behavior issues. Both of Mr. Doe's MDR hearings took place after the 504 Plan was implemented. Clearly, the 504 Plan did not meet Mr. Doe's individual needs to an extent that he could access an education.

55. Defendant's violation of Mr. Doe's rights under Section 504 caused Mr. Doe to suffer damages, including by not limited to psychological, emotional, and reputational damages in addition to the loss of educational opportunities, as well as attorney's fees incurred in this action.

**B. SECOND CLAIM FOR RELIEF**
*(VIOLATION OF PREDETERMINATION)*

56. Mr. Doe incorporates the allegations set forth above as if fully set forth herein.

57. "Predetermination occurs when a school district has decided on its offer prior to the IEP meeting, including when it presents one placement option at the meeting and is unwilling to consider other alternatives." *H.B. v. Las Virgenes Unified Sch. Dist.* (9th Cir. 2007). Predetermination occurs when a school district improperly determines outside of a formal meeting what it will or will not do for the student and refuses to consider additional information or input. *Deal v. Hamilton County Board of Education*, 392 F.3d 840 (6th Cir. 2004); *Spielberg v. Henrico County Public Schools*, 853 F.2d 256 (4th Cir. 1988).

58. An MDR is conducted in substantially the same way, regardless of whether the student is IDEA-eligible or covered only under Section 504. *See Dunkin (MO) R-V Sch. Dist.*, 52 IDELR 138 (OCR 2009) (interpreting the Section 504 regulations at 34 CFR 104.35 to require a manifestation determination prior to a suspension of more than 10 days).

59. OCR has found that the determination of whether a student's misconduct is related to his disability must be made by people knowledgeable about the student and the meaning of the evaluation data. This may be the same group that makes placement decisions. *See Quincy (WA) Sch. Dist. No. 144-101*, 52 IDELR 170 (OCR 2009); and *OCR Memorandum*, 16 IDELR 491 (OCR 1989). *See also, e.g., Metro-Nashville (TN) Pub. Schs.* 66 IDELR 289 (OCR 2015) (A district resolved allegations that a principal, rather than an MDR team, made the decision about whether a middle school student's behavior was a manifestation of his disability.). The MDR team also must include individuals who are knowledgeable regarding Section 504 procedures. *See, e.g., Greenville (TX) Indep. Sch. Dist.*, 113 LRP 27897 (OCR 04/11/13).

60. An MDR team must consider a broad range of data that competent professionals would

require and relevant information that is recent enough to afford an understanding of the student's behavior, such as a psychological evaluation. *See Broward County (FL) Schs.*, 64 IDELR 23 (OCR 2013) (concluding that a resolution agreement remedied allegations that a district failed to consider all information about the student's disability before expelling him from school); and *Pitt County (NC) Schs.*, 64 IDELR 223 (OCR 2014) (finding that an MDR team erred by only reviewing the student's grades, behavior, and disciplinary record while not considering his recent oppositional defiant disorder diagnosis or his psychological report before determining that his behaviors were unrelated to a disability).

61. The prohibition against predetermination, which means determining the outcome before the meeting, applies to IEP team decisions and also applies in the context of manifestation determinations. *See Prince William County (VA) Pub. Schs.*, 68 IDELR 286 (OCR 2016) (holding that although a case manager's email suggested that she assumed there was no link between a ninth-grader's disability and a crime he allegedly committed, the Virginia district didn't predetermine the MDR's outcome).

62. The District was aware that Mr. Doe was a student with disabilities in need of special education services. Despite ample evidence of how Mr. Doe's disabilities affected his behavior and performance in school, the District failed to seriously evaluate him for special education services or develop any sort of behavior intervention plan. The District's failure to properly evaluate and support Mr. Doe was a result of its preexisting belief that he did not require special education services. The District continued to engage in predetermination regarding Mr. Doe's expulsion. On May 28, 2019, the District moved to begin expulsion proceedings. This step was taken before the District met to discuss whether Mr. Doe's behaviors were a manifestation of his disability. On May 30, 2019, Ms. Doe overheard Mr.

Stone stating that he was done with Mr. Doe and would be kicking him out of school. At the MDR hearing in June 2019, the District discussed an incident where Mr. Doe held a pair of scissors up to another students neck. This incident was strikingly similar to a previous incident where Mr. Doe held a screw up to a student's neck. In the incident involving the screw, the District found the behavior to be a manifestation of his disabilities. However, even though the conduct was essentially the same, the school found that the scissor incident was *not* a manifestation of Mr. Doe's disabilities and proceeded to move for expulsion.

63. Based on this conduct, the District clearly made a decision prior to any sort of evaluation that Mr. Doe did not require special education services and did not qualify for an IEP. This predetermination tainted the District's handling of Mr. Doe's behavioral challenges and resulted in an inappropriate removal from school.

## IV. CONCLUSION

68. The District has denied FAPE to John Doe from the moment concerns were raised regarding his disabilities and their impact on his education. It failed to comply with IDEA and conduct an appropriate evaluation that would have provided invaluable information regarding John Doe's disabilities, their impact on his ability to access the curriculum, and accommodations that should be put in place to aid in his access to the curriculum. Instead, the District, not believing Mr. Doe required special education services, created a 504 Plan that was not based on any credible information and that was not reasonably calculated for John Doe to make progress in light of his circumstances. The District failed Mr. Doe in its decision to not evaluate Mr. Doe and in its continued presumption that his behaviors were not the result of any disabilities. Had the District appropriately evaluated Mr. Doe, it would have found that he was a student who required special education services and a behavior intervention plan,

and accommodations could have been put in place to allow Mr. Doe to continue attending school.

## V. REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and enter an order directing the School District to immediately provide compensatory services to John Doe dating back to no later than October 11, 2018, enter an order that requires the School District to pay for all counseling services, mental health services, therapy, other nonacademic services, and educational until John Doe turns 21 years old, and award John Doe his costs and attorney fees and such other relief as the Court deems just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

Respectfully submitted on May 27, 2021,

Kishinevsky & Raykin

_s/ Igor Raykin_
Igor Raykin, #43081
KISHINEVSKY & RAYKIN
2851 S. Parker Rd. Suite 150
Aurora, CO 80014
Ph: (720) 767-1846
Fax: (720) 523-8135
igor@coloradolawteam.com

_s/ Michael Nolt_
Michael Nolt, #50668
KISHINEVSKY & RAYKIN
2851 S. Parker Rd. Suite 150
Aurora, CO 80014
Ph: (720) 863-4256
Fax: (720) 523-8157
michael@coloradolawteam.com

*s/ Allie Parrott*
Allie Parrott, #54188
KISHINEVSKY & RAYKIN
2851 S. Parker Rd. Suite 150
Aurora, CO 80014
Ph: (720) 863-4256
Fax: (720) 523-8157
allie@coloradolawteam.com